**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 2:07-CV-511 |
| | § | |
| GOOGLE INC., YAHOO! INC., IAC | § | |
| SEARCH & MEDIA, INC., AOL, LLC, | § | |
| AND LYCOS, INC. | § | |

**MEMORANDUM OPINION AND ORDER**

**I.     Introduction**

Pending before the court is the defendants' motion to dismiss (Dkt. No. 66). Google Inc. ("Google"), Yahoo! Inc. ("Yahoo"), IAC Search & Media, Inc. ("IAC"), and Lycos, Inc. ("Lycos") (collectively, "the defendants") seek to dismiss this action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The dispute regarding standing focuses on the characterization of certain mergers and acquisitions; two assignments among the various entities associated with the plaintiff, Software Rights Archive, LLC ("SRA"); and a bankruptcy proceeding. For the reasons discussed below, the court denies the defendants' motion.

**II.    Factual and Procedural Background**

SRA filed its complaint against the defendants on November 21, 2007. SRA accuses the defendants of infringing U.S. Patent Nos. 5,544,352 ("the '352 patent"), 5,832,494 ("the '494 patent"), and 6,233,571 ("the '571 patent"). Faced with an infringement action in the Eastern District of Texas, the defendants filed a declaratory judgment action in the Northern District of California against Daniel Egger ("Egger"), SRA, and Site Technologies, Inc. *See Google Inc., et*

*al. v. L. Daniel Egger, et al.*, Civil Action No. 5:08-CV-03172 (N.D. Cal. 2008) ("the declaratory judgment action"). In the declaratory judgment action, the defendants seek a declaration of non-infringement, invalidity, and lack of ownership of the patents-in-suit, as well as a declaration of expiration and unenforceability of the '494 patent.[1] In the present motion, the defendants allege that SRA is not the assignee of the patents-in-suit and, therefore, lacks standing to bring this action.

### A.     The Patents-in-Suit

The '352 patent issued from Application No. 08/076,658, which named Egger as the sole inventor; it was filed on June 14, 1993, and was issued on August 6, 1996. Pursuant to an assignment dated November 9, 1993, and recorded with the United States Patent and Trademark Office ("USPTO"), Egger assigned all his rights in this application, and hence the '352 patent, to Libertech, Inc. ("Libertech"), a Delaware corporation that Egger founded in 1992. On May 17, 1996, a continuation-in-part application to the '352 patent was filed, which named Egger, as well as Shawn Cannon and Ronald D. Sauers, as inventors, and later issued as the '494 patent on November 3, 1998. Pursuant to an assignment dated June 18, 1996, and recorded with the USPTO, all three co-inventors assigned their rights in the application and the later issued '494 patent to Libertech. A divisional application of the '494 patent later issued as the '571 patent on May 15, 2001.

### B.     Deltapoint (a/k/a Site Technologies, Inc.) Purchases Libertech (a/k/a Site/Technologies/Inc.)

On August 22, 1996, Libertech changed its named to Site/Technologies/Inc. ("Site/Tech"). This name change was also recorded with the USPTO. The court will refer to

---

[1] The defendants also claim laches and unclean hands in their declaratory judgment action.

Site/Tech and Libertech, collectively, as Site/Tech, unless necessary to distinguish between the two.

Subsequently, on July 11, 1997, Deltapoint, Inc. ("Deltapoint"), a California corporation, purchased all of the shares of Site/Tech pursuant to a stock exchange agreement that Deltapoint publicly disclosed in a Securities and Exchange Commission ("SEC") filing. *See* Ex. 6 to Defs.' Mot. at 22. Thereafter, Deltapoint changed its name to Site Technologies, Inc. ("Site Tech"). The court will refer to Deltapoint and Site Tech, collectively, as Deltapoint, unless necessary to distinguish between the two.

### C. The 1998 Assignment

On September 16, 1998, Deltapoint allegedly agreed to sell its technology pertaining to a product called "V-Search" to Egger. Deltapoint and Egger entered into a bill of sale, assignment and license agreement ("the 1998 assignment") pursuant to which Egger would pay $100,000 to obtain software, software copyrights, software licenses, trademarks, certain physical property, and rights to the '352 patent and certain related applications. *See* Ex. 10 to Defs.' Mot. The first assignment was filed with the USPTO. It is the characterization of the purchase of Site/Tech by Deltapoint and the subsequent 1998 assignment that forms the basis of the standing dispute.

### D. Deltapoint Files Chapter 11 Bankruptcy; Deltapoint Merges with Site/Tech

After the purported assignment of the '352 patent to Egger, Deltapoint commenced Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Northern District of California. *See In re Site Technologies, Inc. d/b/a Deltapoint, Inc.*, Case No. 99-50736 (Bankr. N.D. Cal. 1999) ("the bankruptcy proceeding"). On June 15, 2000, the bankruptcy court approved Deltapoint's first amended plan of reorganization governing the estate's assets. On December 21, 2000, Deltapoint filed certificates with the California and

Delaware Secretaries of State stating that it merged itself and its subsidiary Site/Tech. Thereafter, all the corporate entities and all their assets had been merged into one entity, Deltapoint. The bankruptcy court entered a final decree on January 6, 2004. The bankruptcy case was re-opened on December 2, 2008. The motion upon which the bankruptcy case was re-opened asserted, among other things, that the patents that are the subject of the above-captioned actions are assets of Deltapoint that were not administered in the bankruptcy proceedings.

### E.  SRA and the 2005 Assignment

Egger formed SRA as a Delaware corporation in September 2004. Egger executed an assignment on February 11, 2005, in which he purported to be the president of Site/Tech and assigned Site/Tech's patent rights over to himself. Thereafter, Egger assigned those patent rights to SRA by virtue of a 2005 assignment ("the 2005 assignment").

### III.  Discussion

The defendants contend that SRA lacks standing. In particular, the defendants argue that there is a defect in SRA's chain of title because Deltapoint was not the record title owner of the patents when it made the assignment to Egger in 1998. SRA's argument sets forth a number of legal theories which arguably vest title of the patents-in-suit with SRA, thus conferring standing. SRA proceeds along two alternative avenues: (1) Deltapoint owned the patents in September 1998 via the stock exchange agreement, and Egger then acquired the patents through the subsequent assignment; or (2) even if the stock exchange agreement did not grant patent rights, Site/Tech as the subsidiary, would be bound by the assignment under equitable principles.

In support of SRA's argument that Deltapoint owned the patents via the stock exchange agreement, it argues the following theories: (1) the stock exchange agreement, by operation of law, vested title of the patents with Deltapoint; (2) the articles of incorporation operated as a

written conveyance, transferring ownership of the patents to Deltapoint; (3) Site/Tech ratified the assignment of the patent rights from Deltapoint to Egger; and (4) a de facto merger occurred as a result of the stock exchange agreement.  In support of SRA's alternative argument that Site/Tech, as a subsidiary, was bound by the assignment, SRA argues the following:  (1) Deltapoint was acting as the alter ego of Site/Tech; and (2) Deltapoint and/or Jeffrey Ait ("Ait"), the Chief Executive Officer of Deltapoint, had actual or apparent authority to bind Site/Tech or Site/Tech ratified the acts of its purported agent under agency law.

Under the applicable standards and evidence in support, the court finds that at the time of the 1998 assignment, Deltapoint and Site/Tech were alter egos of one another.  Because the court finds in favor of SRA on the alter ego issue, the court will forgo analysis of standing under the remaining common law theories.

    **A.**    **Law**

        **1.**    **Standing**

Federal Rule of Civil Procedure 12(b)(1) is the procedural mechanism for challenging a court's subject matter jurisdiction.  *See Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id*.  The party asserting jurisdiction bears the burden of proof.  *Id*.  "The burden of demonstrating standing falls to [the plaintiff], as '[i]t is well established . . . that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue.'"  *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026 (Fed. Cir. 1995) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990); citing

*Sicom Sys., Ltd. v. Agilent Tech., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005)).  "In examining a Rule 12(b)(1) motion, the court is empowered to consider matters of fact which may be in dispute." *Id.* at 161.  Conversely, undisputed facts present in the record are accepted as true. *Id*. When jurisdiction rests on a disputed factual issue, however, the court reviews the parties' submitted evidentiary materials, and the plaintiff must prove that the facts supporting subject matter jurisdiction are true by a preponderance of the evidence.  *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

A plaintiff seeking damages for infringement of a patent must hold legal title to that patent.  *See*, *e.g.*, *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995); *Speedplay, Inc. v. Bebop*, 211 F.3d 1245, 1249-50 (Fed. Cir. 2000) (citing 35 U.S.C. §§ 100(d), 261, 281). A party without title has no standing to bring suit.  *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991); *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995) ("The right to sue for infringement is ordinarily an incident of legal title to the patent.").  "Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing."  *Isreal Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007).  Legal title, which confers standing, must be held at the inception of the lawsuit.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n. 5 (1992) (plurality opinion). Section 100(d) provides that a "'patentee' includes not only the patentee to whom the patent was issued but also the successor in title to the patentee."  35 U.S.C. § 100(d).

### 2. Assignment of Patent Rights

Initial ownership of a patent vests in the inventor by operation of law.  *See Regents of University of New Mexico v. Knight*, 321 F.3d 1111, 1118 (Fed. Cir. 2003); *Bellehumeur v. Bonnett*, 127 Fed. Appx. 480, 484 (Fed. Cir. 2005).  Section 261 of the Patent Code, however,

provides that inventors can assign all or part of their interest in a patent and imposes minimal requirements for such assignment. *Id*. Under Section 261:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States. . . . 35 U.S.C. § 261.

When determining ownership of a patent in the context of a contract or agreement, state law governs. *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008); *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1578-79 (Fed. Cir. 1997). Moreover, "[c]onstruction of patent assignment agreements is a matter of state contract law." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 2008 WL 2229783, at *9 (Fed. Cir. 2008).

**B.     Application**

To determine whether a corporate identity should be disregarded, the court looks to the law of the state of incorporation. *See Davaco, Inc. v. AZ3, Inc.*, 2008 WL 2243382, *1 (N.D. Tex. 2008); RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 307, 309 (1971).

**1.     Alter Ego**

Under the laws of Delaware, there are a number of factors that are pertinent to the alter ego analysis; however, "no single factor [can] justify a decision to disregard the corporate identity, but that some combination of them was required, and that an overall element of injustice or unfairness must always be present, as well." *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, *5 (Del. Ch. 1989) (quoting *U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D. Del. 1988)). Accordingly, under Delaware alter ego analysis, Site/Tech and Deltapoint (1) must have been operating as a single economic entity, and (2) an overall element of injustice or unfairness must have been present. "Simply phrased, the standard may be restated as: whether

[the two entities] operated as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D. Del. 1990) (internal citations omitted). Factors that tend to show that the two entities are operating as a single economic unit are as follows:

> factors which reveal how the corporation operates and the particular [party's] relationship to that operation [, including] whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder. *Harco*, 1989 WL 110537 at *4.

The evidence presented by SRA strongly suggests that, at the time of the 1998 assignment, Site/Tech and Deltapoint were operating as a single economic entity. *See* Ex. 7, 11-16 to Pl.'s Resp. Uncontroverted testimony of Ait indicates the following: Site/Tech and Deltapoint had the same business department; Site/Tech did not have any employees or operations of its own; Site/Tech and Deltapoint filed consolidated financial statements; Deltapoint filed Site/Tech's tax returns; Deltapoint directly employed all of Site/Tech's former employees and paid virtually all of its expenses; Site/Tech did not receive any independent business; Site/Tech's sole source of revenue were royalties paid to it by Deltapoint; Site/Tech did not design, produce, market, or sell anything; Deltapoint used and represented that it owned all of Site/Tech's assets; Site/Tech had no independent daily operations; Site/Tech failed to observe corporate formalities; Ait signed the 1998 assignment, as director and Chief Executive Officer of both Deltapoint and Site/Tech; and Site/Tech and Deltapoint had the same bank account. *See* Ex. 7 to Pl.'s Resp. According to the stock exchange agreement, Site/Tech was wholly owned by Deltapoint, and Site/Tech and Deltapoint had identical directors and officers. *See* Ex. 11.

Representations made to the SEC indicate that Deltapoint was liable for the debts of Site/Tech and assumed Site/Tech's liabilities in connection with the stock exchange. *See* Ex. 12-16 of Pl.'s Resp.

In response, the defendants point to the following evidence to controvert the assertion that Site/Tech and Deltapoint were a single economic unit: Site/Tech filed its own tax returns; Site/Tech retained offices and three employees in North Carolina; Site/Tech released a software product under its name; and testimony by Ait that Site/Tech was not a shell entity after its acquisition by Deltapoint.

The 2001 tax return on which the defendants rely reflect earnings from 1998 and 1999 and are seemingly the result of an internal royalty structure established as a result of the 1997 transaction—there is no indication that Site/Tech earned those funds through any independent business operation. *See* Ex. 11, 20 to Pl.'s Resp. Furthermore, the filing date of the tax return and the fact that the return reflects no further revenues suggest that Site/Tech did not have any independent operations in 1998 and 1999. *Id.*

In support of the retention of officers and employees in North Carolina, the defendants rely on Ait's deposition. *See* Ex. 2 to Defs.' Reply at 81, ll. 11-19; 82, ll. 8-21. The testimony, however, is pulled out of context. Further testimony indicates that Ait agreed to keep three employees in North Carolina as employees of Deltapoint. *See* Ex. 3 to Pl.'s Sur-Reply at 107, ll. 2-4.

As to the independent release of software by Site/Tech, this evidence does not indicate that Site/Tech and Deltapoint were distinct entities in 1998. The evidence, two press releases, were released a mere month after the 1997 transaction. Furthermore, the press releases contain a number of indications that Deltapoint and Site/Tech were in economic unity: the headline reads,

"Deltapoint and Site/technologies/inc. deliver SiteSweeper 2.0 . . ."; there are indications that Site/Tech employees had already integrated into Deltapoint; the press release states that, "Deltapoint plans to release SiteSweeper 2.0 on the company's Web site"; and, finally, the press release heavily discusses Deltapoint, with little to no discussion of Site/Tech as a separate entity. *See* Exs. 7-8 of Defs.' Mot. Furthermore, SEC filings indicate that SiteSweeper 2.0 technology was actually a product of Deltapoint and not Site/Tech.

Finally, with respect to the Ait deposition testimony concerning whether Site/Tech was a shell entity, again, the defendants take his testimony out of context. As explained in his deposition, Ait did not agree with the characterization by defense counsel of Site/Tech as a non-shell entity of Deltapoint. *See* Ait Depo. at 107-08 (Ex. 3 to Pl.'s Sur-Reply). On balance, the evidence presented by the defendants does not sufficiently controvert the overwhelming evidence to the contrary suggesting that Site/Tech and Deltapoint were operating as a single economic entity in September of 1998.

As to the second prong, Delaware courts will not disregard the corporate form and treat two corporations as one unless equity so demands. S*ee Pauley Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968). Although this equitable power is broad, "persuading a Delaware court to disregard the corporate entity is a difficult task." *Harco Nat. Ins. Co.*, 1989 WL 110537 at *4; *see also Sears, Roebuck & Co. v. Sears plc*, 744 F.Supp. 1297, 1305 (D. Del. 1990) (stating, "[i]t is only the exceptional case where a court will disregard the corporate form. . . ."). Accordingly, the second step of the analysis requires a strong showing that an overall element of injustice or unfairness is present. This showing of injustice or unfairness does not require a showing of fraud per se—instead, the corporate veil may be pierced "in the interests of justice, when such matters as fraud, contravention of law or contract, public wrong, or where

equitable considerations among members of the corporation require it, are involved." *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968). Furthermore, "the fraud or similar injustice that must be demonstrated in order to pierce a corporate veil under Delaware law must, in particular, 'be found in the [parties'] use of the corporate form.'" *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bkrtcy. D. Del. 2003).

In this case, the corporate distinction between Deltapoint and Site/Tech should be disregarded for the purposes of vesting title to the patents-in-issue to Egger. Several facts counsel the court to reach this result. First, the 1998 assignment contained a warranty, that "[Deltapoint] hereby transfers good and marketable title to the Purchased Assets." *See* Ex. 10 to Defs.' Mot. at ¶ 2. Second, it is undisputed that Egger paid at least $80,000 of the $100,000 due under the assignment for the patents. Furthermore, Site/Tech affirmed to the SEC that it had sold title to the patents to Egger. *See* Ex. 17 to Pls.' Resp. Finally, there is evidence that Ait, on behalf of both Site/Tech and Deltapoint, ratified the 1998 assignment and disclaimed ownership of the patents in Egger's favor. *See* Ex. 7 to Pl.'s Resp. Under these facts, the equities in favor of preventing injustice and contravention of contract strongly demand a piercing of the corporate veil. As indicated above, Site/Tech had no independent ownership, directors, officers, employees, property, offices, business dealings, business departments, headquarters, products, corporate records, bank accounts, director meetings, shareholder meetings, or operations in September 1998. The factual record before the court strongly favors SRA.[2] It must be remembered that it was the parent corporation which represented it owned the patent and could convey title. From Egger's perspective, it would be inequitable to allow Deltapoint or Site/Tech

---

[2] The defendants further argue that SRA is not entitled to raise an alter ego claim in light of Deltapoint's bankruptcy. As the court finds that Deltapoint assigned the patents to Egger in September 1998, prior to the bankruptcy, such argument is irrelevant.

to hide behind the corporate fiction. Deltapoint's wholly-owned subsidiary, Site/Tech, is bound by the 1998 assignment, and Egger obtained title to the patents.

### 2. Bankruptcy Issues

The parties dedicate a number of pages of their respective briefs to addressing bankruptcy-related issues. Because the court finds that Egger acquired title to the patents-in-suit by virtue of the 1998 assignment, and the assignment preceded the bankruptcy proceeding, the court concludes that the bankruptcy issues are not relevant for the purpose of assessing standing.

## IV. Conclusion

For all the foregoing reasons, the court finds that, regardless of whether the 1997 stock exchange agreement vested title to the patents-in-suit to Deltapoint, Site/Tech is bound by the 1998 assignment to Egger. At the time of the assignment to Egger, Site/Tech and Deltapoint were operating as a single economic entity. Furthermore, the interests of justice and the compelling equities in favor of SRA (claiming through Egger) compel the court's decision. Accordingly, the court denies the defendants' motion to dismiss (Dkt. No. 66).

SIGNED this 31st day of March, 2009.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE